**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

———————————————————— :
LINDA GARDNER,                     :
                                   :        Civil Action No.
                Plaintiff,         :        04-5141 (NLH)
                                   :
        v.                         :
                                   :
UNUM LIFE INSURANCE COMPANY        :            **OPINION**
OF AMERICA,                        :
                                   :
                Defendant.         :
———————————————————— :

**APPEARANCES:**

Thomas J. Hagner, Esq.
Hagner & Zohlman LLC
Commerce Center
1820 Chapel Avenue West
Suite 160
Cherry Hill, NJ 08002
*Attorney for Plaintiff Linda Gardner*

Steven P. Del Mauro
McElroy Deutsch Mulvaney
 & Carpenter
1300 Mt. Kemble Avenue
P.O. Box 2075
Morristown, NJ 07962-2075
*Attorney for Defendant Unum Life Insurance Company of America*

**HILLMAN, District Judge**

**INTRODUCTION**

Plaintiff Linda Gardner filed an ERISA claim against defendant Unum Life Insurance Company of America pursuant to 29 U.S.C. § 1132(a)(1)(B), for denial of long term disability benefits. This Court has jurisdiction over this case under 28

U.S.C. § 1331, as it presents a question arising under federal law.  The parties have filed cross motions for summary judgment. We conclude, under a heightened review, that plaintiff has not met her burden of proving that defendant's decision to discontinue her long term disability benefits was arbitrary and capricious.

<u>**BACKGROUND**</u>

The following facts are not in dispute by the parties. Plaintiff, Linda Gardner, was employed by Thomas Jefferson Hospital as an operating room nurse.  Defendant Unum Life Insurance Company of America ("Unum") issued a policy of group disability insurance to the Pennsylvania Health Care Group Insurance Trust.  That policy funded, in whole or in part, an ERISA governed employee welfare benefit plan established and maintained by Thomas Jefferson Hospital for short-term disability and long-term disability insurance coverage to its employees ("Plan").  Unum administered and funded the Plan.

In July 2001, Gardner was diagnosed with avascular necrosis ("AVN") in both knees and stopped working.[1]  On August 20, 2001, she underwent bilateral knee replacement surgery.  The surgery

---

[1]  AVN is a disease resulting from the temporary or permanent loss of blood supply to the bones.  Without blood, the bone tissue dies and the bone may collapse. <u>See</u> National Institutes of Health/National Institute of Arthritis and Musculoskeletal and Skin Diseases website at <u>http://www.niams.nih.gov/hi/topics/osteonecrosis/index.htm.</u>

was unsuccessful and, on February 5, 2002, Gardner underwent a
second surgery on both knees.  Gardner received short term
disability benefits under the Plan from August until January
2002.  In January 2002, her claim was forwarded to Unum's long
term disability unit for further consideration.

Under the terms of the Plan for long term disability, a
covered employee is disabled when Unum determines:

- you are **limited** from performing the **material
  and substantial duties** of your **regular
  occupation** due to your **sickness** or **injury;**
  and

- you have a 20% or more loss in your **indexed
  monthly earnings** due to the same sickness or
  injury.

After 24 months of payments, you are disabled when
Unum determines that due to the same sickness or
injury, you are unable to perform the duties of
any **gainful occupation** for which you are
reasonably fitted by education, training or
experience.

(emphasis in original).

"Material and substantial duties" are defined by Unum as duties
that:

3

- are normally required for the performance of
your regular occupation; and

- cannot be reasonably omitted or modified, except
that if you are required to work on average in
excess of 40 hours per week, Unum will consider
you able to perform that requirement if you are
working or have the capacity to work 40 hours per
week.

"Regular Occupation" is defined by Unum as
the occupation you are routinely performing when
your disability begins.  Unum will look at your
occupation as it is normally performed in the
national economy, instead of how the work tasks
are performed for a specific employer at a
specific location.

For registered nurses, your "regular occupation"
means your speciality in the practice of nursing
which you are routinely performing when your
disability begins.

Following Gardner's second surgery of a bilateral knee
revision in February 2002, Gardner underwent physical therapy and
was being treated for pain management.  By letter dated February
18, 2002, Unum notified Gardner that it approved her claim for

4

long term disability benefits pursuant to the policy and
definitions quoted above.

After its initial approval, Unum continued to investigate
Gardner's claim for LTD benefits.  In May 2002, Gardner submitted
a supplemental statement to Unum signed by her doctor at that
time, Robert Booth, M.D., that provided that she was unable to
work and would not be expected to be released to work in her
occupation until September 2002.[2]  In June 2002, Gardner
submitted additional medical records to Unum including an MRI
report indicating that Gardner was exhibiting AVN in her right
ankle.

Gardner had been out of work since her diagnosis in July
2001 until November 2002.  In November 2002, Gardner begin
working part-time at a surgical center located about ten minutes
from Gardner's home.  Her job consisted of providing lunchtime
breaks to the full time staff.  Gardner maintains that she could
work no more than ten hours a week, not more than two or three
hours at a time, and no more than two days in a row.  To go
beyond those parameters, Gardner states would cause her severe
pain in her legs.  A "Claimant's Supplemental Statement" signed
by Dr. Friedenthal and dated April 18, 2003, indicated that
Gardner could not work more than ten hours per week, and the

---

[2]  A question mark appears after the word "Sept." suggesting
that the month may have been in doubt by the doctor.

maximum number of hours that Gardner could perform a sedentary activity (defined on the from as "10lbs maximum lifting or carrying articles. Walking/standing on occasion. Sitting 6/8 hours.") was two to three hours, every other day.  Gardner continued to receive LTD benefits while working at the surgical center.

Unum continued its investigation into Gardner's claim for LTD benefits in the spring of 2003.  During that time, a consultant for Unum, Kathy Pepin, M.S., R.N., made several attempts to contact Dr. Friedenthal by telephone.  Eventually, she wrote to him by letter dated May 14, 2003, asking whether Gardner had the "capacity in a sedentary occupation, where she can alternate at her own will to sit or stand for a period of 8 hours a day."  After several follow-up telephone calls by Nurse Pepin, Dr. Friedenthal responded by letter dated July 16, 2003.  Dr. Friedenthal wrote that Gardner "has achieved a level of activity that allows her to work for 10 hours a week and this appears to be at a maximum level.  I do not anticipate any significant change in her clinical status and, therefore, do not anticipate a significant change in her ability to be gainfully employed."  He writes further that Gardner's "condition in her ankles may worsen with time and the status of her knees may also worsen with time and may contribute to an increased level of disability in the future."

Gardner also submitted a letter to Unum dated July 14, 2003, in response to an inquiry by Unum.  Gardner stated that she had an oversized implant in her knee that caused extreme pressure and pain in that joint; that the pain and pressure worsened both by activity and when she was seated with her feet on the floor; that pain medication did not relieve her symptoms; and that although narcotics helped, she could not take them everyday.  Unum conducted a review of Gardner's claim and approved her receipt of continued long term benefits.

The event that precipitated this litigation began on January 21, 2004, when after receipt of 24 months of LTD benefits, the definition of disability changed under the terms of the Plan. Gardner had been receiving LTD benefits under the "regular occupation" definition.  After January 21, 2004, Unum reevaluated Gardner's claim to determine whether she was unable to perform the duties of "any gainful occupation" for which she was reasonably fitted by education, training or experience.  In anticipation of the change in qualification for benefits, Unum requested in November 2003, that Bethany Washburn, RN, conduct a review of Gardner's file, including Dr. Friedenthal's July 2003 letter.  After reviewing the file, Nurse Washburn questioned why Gardner could not increase her employment in a job that was sedentary with proper accommodations.  In December 2003, Unum requested that Deede Delay conduct a transferable skills

analysis.  Ms. Delay identified certain sedentary occupations that she thought Gardner would qualify for employment, such as: discharge planner, managed health care manager, insurance case manager, triage nurse and bill reviewer.

Conversely, in February 2004, Kathy Pepin, RN reviewed Gardner's file and concluded that working 10 hours a week was Gardner's maximum level of activity.   The file was then forwarded to Unum's medical consultant, Barry Gendron, D.O., for review.  Dr. Gendron wrote to Dr. Friedenthal by letter dated February 13, 2004, asking whether Dr. Friedenthal agreed with his assessment that Gardner could "work full-time in a sedentary job with only occasional standing or walking."  At the bottom of Dr. Gendron's letter were two paragraphs, each with a blank signature line for Dr. Friedenthal as follows:

> I agree that Linda S. Gardner has the capability
> to perform sedentary work activities for eight
> hours a day with no lifting greater than 10
> pounds, only occasional standing or walking, and
> sitting 6-8 hours per day. (She is currently
> working 3 hours a day in a vocation that has
> greater than sedentary work requirements).
>
> Roy Friedenthal, M.D. _____  Date: _____
>
>
>
> I do not agree that Linda S. Gardner can work
> eight hours per day in a sedentary occupation for
> the following objective reasons:
>
> Roy Friedenthal, M.D. _____  Date: _____

8

On or about March 2, 2004, Dr. Friedenthal responded to Dr. Gendron's letter by signing his name under the first paragraph agreeing that Gardner could perform sedentary activities for eight hours a day, and wrote in the following qualification: "she should be allowed to change her position frequently as required. Need footrest to accommodate knee contracture."

Gardner's file also contained a typewritten notation dated March 1, 2004, in which Dr. Freidenthal wrote that Gardner returned for a disability assessment.  He states in part that:

> The disability carrier is requesting my re-evaluation as to her disability status. I do not believe she can work as an OR circulator full time.  She could perform sedentary work on a full time basis, but needs accommodation with foot rest because of her extension contracture in the left knee and needs to be allowed to change her position frequently, as sitting for long periods of time tends to bring out cramping of quadriceps muscles.  It is now two years since her replacement [surgery] and I believe her level of disability will be chronic in nature."

On March 12, 2004, Unum notified Gardner that her benefits were discontinued.  The Policy provides that if a claim is denied, the employee has a right to file an appeal and that Unum "will make a full and fair review of the claim... ."  Gardner appealed the decision of Unum to discontinue her LTD benefits. In support of her appeal, Gardner submitted, through her counsel, various medical records and reports, a letter from Gardner explaining the limitations she experiences due to her AVN

9

condition, articles on AVN, and a letter received by Gardner from CIGNA advising her that she did not receive the case management position for which she interviewed.  Gardner also submitted a vocational expert report from Charles A. Kincaid, Ph.D.

As part of the appeal process, Unum submitted Gardner's file, along with the documents supplied by Gardner, to Nurse Richard Cole and Dr. George Z. Seiters.  Nurse Cole stated in part that it appeared that Gardner may not be able to tolerate full time sedentary employment due to her pain level.  Dr. Seiters concluded that Gardner was capable of performing full time sedentary work with accommodations to elevate her legs and to frequently reposition her knees while sitting.

By letter dated September 27, 2004, Unum advised Gardner that it was upholding its decision to deny her LTD benefits. Unum also advised Gardner that she could perform the occupations of bill reviewer (utilization review), insurance case manager, managed health care manager, and telephonic triage nurse.[3]

Both parties submitted motions for summary judgment.  For the reasons explained below, we grant Unum's motion.

---

[3] Gardner obtained her nursing degree in 1997, and had 18 months' experience working as an operating room nurse before she went out of work on short term disability.

10

**DISCUSSION**

**A.    Summary Judgment Standard**

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor."  Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has

11

met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

**B.  Standard of Review Under ERISA**

ERISA provides that a plan participant or beneficiary may bring a suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  ERISA, however, does not specify a standard of review for an action brought under § 1132(a)(1)(B).  See Mitchell v. Eastman Kodak Co., 113 F.3d 433, 437 (3d Cir. 1997).  The Supreme Court addressed the issue and determined that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  Where the plan affords the

12

administrator discretionary authority, a district court's grant of summary judgment is made under an arbitrary and capricious standard.  See Nazay v. Miller, 949 F.2d 1323, 1334 (3d Cir. 1991); Stoetzner v. U.S. Steel Corp., 897 F.2d 115, 119 (3d Cir. 1990).

In this case, it is undisputed that the Plan afforded Unum discretionary authority.  Accordingly, an arbitrary and capricious standard will be applied.[4]  Under this standard of review, an administrator's decision must be affirmed unless it was "without reason, unsupported by substantial evidence or erroneous as a matter of law."  Abnathya v. Hoffman-LaRoche, Inc., 2 F.3d 40, 45 (3d Cir. 1993) (quotations and citations omitted).  A court is not free to substitute its own judgment for that of the administrator's in determining eligibility for plan

---

[4] Gardner argues that the standard should be *de novo* because, pursuant to NJSA 17B:26(1)(h)(z) and NJSA17B:27(49)(g) (statutes which permit the Department of Banking and Insurance of New Jersey to disapprove of individual and group health insurance forms on the basis that they are "unjust, unfair, inequitable, misleading, contrary to law or to the public policy of [New Jersey])," the Director of the Department of Banking and Insurance, Donald Bryan, issued a letter "disapproving" a carrier's use of discretionary clauses in all health insurance policies and contracts.  It is axiomatic that in order to carry the weight of a rule of law, an administrative rule must have certain features and have gone through the applicable rule-making process. See, e.g., Metromedica, Inc. v. Director, Division of Taxation, 478 A.2d 742, 751 (N.J. 1984).  There is no evidence that Director Bryan's letter went through such a process.  Therefore, it does not have the force and effect of a rule of law and will not be considered by this Court.  Moreover, there is no evidence that any determination by the Department of Banking and Insurance was made regarding the policy at issue.

benefits.  Id. (citations omitted).

However, another layer is introduced because Unum both
funded and administered the Plan.  In situations where the
insurer both funds and administers the plan, the Third Circuit
has ruled that a heightened standard of review is required.  See
Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 383 (3d
Cir. 2000).  This is because when a fiduciary both funds and
administers a Plan, a potential conflict of interest is inherent.
Id.  The conflict arises when the fund from which monies are paid
is the same fund from which the insurance company reaps its
profits.  Id. at 378.  Where a plan fiduciary acts under a
conflict of interest in making an eligibility for benefits
decision, that decision is reviewed on a "sliding scale."  Id. at
392.  This sliding scale approach is deferential, but not
absolutely deferential, and allows each case to be examined on
its facts.  Id.  A court may consider "the nature and degree of
apparent conflicts with a view to shaping [its] arbitrary and
capricious review of the benefits determinations of discretionary
decisionmakers."  Id. at 393.

One important aspect in determining if a conflict of
interest exists is whether payment of benefits impacts the
fiduciary's profits.[5]  For example, a conflict may be ameliorated

---

[5]  Other factors the Court can consider include the
sophistication of the parties and the current status of the

where "the plan is experience-rated . . . . [T]he premiums charged to the employer are adjusted annually based on claims paid the previous year and thus the fiduciary's incentive to deny claims to increase profits is lessened, if not eliminated." Metropolitan Life Ins. Co. v. Potter, 992 F. Supp. 717, 730 (D.N.J. 1998), cited in Pinto, 214 F.3d at 388 n.6. Another possibility is if all benefits payments made to plan participants were made from a trust established solely for that purpose and the corporation could not tap the fund for other uses. See Mitchell, 113 F.3d at 437 n. 4. This would provide an insulated or independent source of funds.

Since there is no evidence that Unum's payment of benefits is independent of its profits, we determine that a conflict of interest exists warranting application of a heightened arbitrary and capricious standard of review. See Pinto, 214 F.3d at 388. Under this standard, the record that is reviewed by the Court consists only of "... evidence that was before the administrator

_____

employer fiduciary. Pinto, at 392. There does not appear to be a conflict with regard to the factor of sophistication of the parties. Gardner was represented by an attorney through the appeal process. It does not appear that Gardner was unsophisticated in her understanding of the process or her rights under the Plan. There also appears to be no conflict regarding the employer fiduciary, Thomas Jefferson University ("TJU"). Although neither party provided information on this factor, TJU is presumed to be a stable employer and "will act as a repeat player." Pinto, 214 F.3d at 392.

15

when he made the decision being reviewed."[6] <u>Mitchell</u>, 113 F.3d at 440.  Based on our heightened review of the record, Unum's decision to deny LTD benefits to Gardner was not arbitrary and capricious.

## C.   Heightened Arbitrary and Capricious Review

If there was no inherent conflict, we would only have to decide whether Unum's denial of benefits was arbitrary and capricious.  Under the more deferential arbitrary and capricious standard, we would find in favor Unum since there is evidence in the record that its decision was based on information supplied by Gardner's treating physician that Gardner was able to work in a sedentary position for eight hours a day with certain restrictions.  However, because an inherent conflict exists due to Unum's funding and administering the plan, a heightened arbitrary and capricious review is required. <u>Pinto</u>, 393.  This standard is still deferential, but not absolutely deferential. <u>Id.</u>  It requires that we apply a sliding scale and "consider the

---

[6] In her opposition to Unum's Motion for Summary Judgment, Gardner asserts that Unum introduced "new evidence" into the record by arguing that Gardner was ineligible for LTD benefits because she was able to work part-time but chose not to do so. Unum replied that it was not introducing a new claim determination but was demonstrating to the Court the Plan's construction as a total disability policy.  Following the law in this Circuit, this Court will only consider the record, including the grounds for determination, that were before the administrator at the time of his or her decision and will not consider extrinsic information. <u>Mitchell</u>, 113 F.3d at 440.

nature and degree of apparent conflicts with a view to shaping [our] arbitrary and capricious review of the benefits determinations of discretionary decisionmakers." Id.  Thus, we take a closer look at the process that culminated in Unum denying LTD benefits to Gardner.

One of the criticisms that Gardner raises is that Unum improperly relied on Dr. Friedenthal's March 2004 opinion. Gardner alleges that Dr. Gendron, as an agent of Unum, supplied Dr. Friedenthal with incorrect information about Gardner and that Dr. Friedenthal relied on that incorrect information in providing his March 2004 opinion.  Specifically, Gardner alleges that Dr. Gendron wrote that she was "working 10 hours per week as an operating room circulating nurse," while Gardner maintains that the maximum number of hours she could work was 10 hours, often working less than that or not at all, and for no more than two to three hours at a time.  Further, Gardner maintains that she was able to do part time work because the job was only ten minutes from her home and she only provided lunch relief; she did not perform the duties of an OR circulating nurse.  In addition, Gardner criticizes Dr. Gendron's letter because it failed to include her daily limitations in performing activities, her pain level, and the fact that pain medication did not alleviate her symptoms.  Moreover, the Gardner points out that the letter failed to explain that on days when she worked, after returning

17

home, all she could do was sit with her legs up.

In addition to supplying Dr. Friedenthal with incorrect information, Gardner argues that Dr. Gendron's letter impaired her relationship with Dr. Friedenthal.  Gardner asserts that Dr. Friedenthal became angry with her after receiving Dr. Gendron's letter because Dr. Friedenthal thought that Gardner was not telling him the truth about her ability to work.  Aside from Gardner's assertions, there is no evidence in the record to back-up her claim.  Rather, Gardner criticizes Unum for failing to follow up with Dr. Friedenthal to ascertain the basis of his opinion in his March 2004 letter.

With respect to Unum's vocational evaluation, Gardner argues that the evaluator was not given reports by Nurse Cole or Dr. Seiters that specified Gardner's physical restrictions and limitations.  Further, Gardner states that the record contains no analysis as to whether she is qualified for the jobs identified by the vocational expert.

Unum responds to Gardner's criticisms by arguing that its decision was not arbitrary and capricious, but rather based on an investigation.  It maintains that it provided Gardner with STD and LTD benefits as required under the policy and only discontinued her benefits after it received the opinion from her treating physician, as well as evaluations from Unum's various medical and vocational evaluators, that she could work full time

18

in a sedentary position with certain accommodations.  Unum points

out that Gardner, who relied on Dr. Friedenthal's medical opinion

throughout the process, failed to obtain a different opinion from

him after he stated she would work full time in a sedentary

position.  Unum also points out that the report of Gardner's

expert, Charles A. Kincaid, Ph.D., although it opined she could

not work full time in any occupation, did not include Dr.

Friedenthal's March 2004 evaluations.  Finally, Unum points to

the experience and qualifications of their vocational experts, as

well as the information contained in the record, to support a

finding that Unum conducted a reasonable vocational assessment.

In reviewing the record as a whole, the opinion of Dr.

Friedenthal, as Gardner's treating physician, stands out as

important in the determination of her LTD benefits.  Both parties

seem to agree on the importance of his opinion since they both

continuously highlight the gross oversight, or deliberate

failure, of the other party to simply ask Dr. Friedenthal if he

was basing his March 2004 opinion on his physical examination of

Gardner or upon information supplied by Unum.[7]  This raises the

---

[7] In determining whether to grant Unum's summary judgment,
we take all inferences in the light most favorable to Gardner.
Even so, it does not appear that Dr. Gendron's statements in his
letter to Dr. Friedenthal were incorrect, but rather may not have
been as comprehensive or as detailed as Gardner would have liked.
Dr. Friedenthal physically examined Gardner on the same day that
he responded to Dr. Gendron and, therefore, had an independent
personal basis for his March 2004 opinion.  In addition, his July
2003 letter which states that 10 hours was the maximum that
Gardner could work did not specify whether it was sedentary or

question of who had the responsibility to obtain clarification from Dr. Friedenthal.  To answer this question we look back to the arbitrary and capricious standard under heightened review.

Although we apply a higher standard of review in reviewing Unum's denial of LTD benefits, the burden of proving to what degree the conflict of interest affected Unum's decision rests on the plaintiff. See Pinto, at 392.  Thus, the burden remains with Gardner to demonstrate how, under heightened scrutiny, Unum's decision to deny her benefits was arbitrary and capricious. Gardner has not met this burden.

The record indicates that Unum approved STD and LTD benefits to Gardner during the time that her treating physician, Dr. Friedenthal, provided a medical opinion that Gardner could not work full time in a sedentary position.  Unum continued to provide LTD during the time that Gardner worked part time providing lunch time relief at a nearby surgical center.  It was not until Dr. Friedenthal wrote that she could work full time in a sedentary position, if permitted to change the position of her legs frequently and elevate her legs on a footstool, that Unum discontinued her LTD benefits under the "any gainful occupation" definition under the Plan.  Gardner's claim that Dr. Friedenthal

---

nonsedentary work. In his clinical notes dated April 7, 2003, Dr. Friedenthal wrote that Gardner was working 10 hours per week as a circulating nurse.  This suggests that Dr. Gendron was not deliberately supplying misinformation, but obtained the information from Gardner's file.

became angry with her based on what Dr. Gendron wrote in his letter is unsupported.  Dr. Friedenthal physically examined Gardner the very day that he responded to Dr. Gendron's letter. There is no evidence in the record that would support a claim that Dr. Friedenthal would sit in angry silence and fail to ask his patient questions about her ability to work.  Nevertheless, if Gardner felt that Dr. Friedenthal was misinformed, it was incumbent upon her to pursue an explanation from him and to clarify his opinion about her ability to perform sedentary work.

While we are not unsympathetic to the plaintiff's condition, and the physical limitations it has caused, our task is to decide whether Unum's decision to deny her LTD benefits under the definition of disabled under the Plan was unsupported in the record.  While the record indicates that different medical professionals can come to different conclusions regarding Gardner's ability to work, Unum's reliance upon the opinion of Gardner's treating physician that Gardner could work eight hours a day in a sedentary position with certain accommodations was neither arbitrary nor capricious.   The record provides that Dr. Friedenthal provided an informed opinion regarding his patient's abilities and any doubts that Gardner may have had as to the basis of that opinion were her responsibility to dispel.

21

## <u>CONCLUSION</u>

For the foregoing reasons, Unum's motion for summary judgment is granted and Gardner's motion for summary judgment is denied.  An Order consistent with this Opinion will be entered.


                                    s/Noel L. Hillman

Camden, New Jersey                  NOEL L. HILLMAN, U.S.D.J.

Dated: December 8, 2006